HUMPHREYS *et al. v.* ST. LOUIS, I. M. & S. RY. Co.

(*Circuit Court, S. D. New York.* January 24, 1889.)

1. RAILROAD COMPANIES—CONTRACTS—ULTRA VIRES.

A railroad company, a corporation of Ohio, Indiana, Illinois, and Missouri, which had equipped its road under an agreement with a car trust, leased the road and equipments to defendant, a railroad company, which, to induce the car trust to leave the equipments on the road, agreed to pay the balances unpaid by its lessor at certain times, in consideration of which payments the car trust agreed to transfer and assign all its interest to defendant. All the states in which the company was incorporated, except Indiana, provided for the lease of one railroad by another. The laws of Missouri provided that the lease should not be binding until at a meeting of the stockholders, called for that purpose, a majority assented thereto in writing, or until the holders of a majority of the stock assented thereto in writing, and a certificate, signed by the president and secretary, was filed with the secretary of state. No meeting was called of defendant's stockholders, but a certificate was filed, signed by the president, who owned nearly all of the stock, and the secretary, and the road was operated by defendant without any objection from its lessor. *Held,* in an action by the car trust on its agreement with defendant, that defendant could not plead *ultra vires* as to the lease.

2. FRAUDS, STATUTE OF—AGREEMENT TO PAY DEBT OF ANOTHER.

The defendant having obtained the use of the equipments by its agreement to pay the balance unpaid by its lessor, the consideration was the use of the property and the right to acquire title by such payment, and the contract was a direct undertaking, and not a guaranty, within the statute of frauds.

At Law.

*George De Forest Lord* and *James B. Townsend*, for plaintiffs.

*John F. Dillon, Thomas J. Portis*, and *Rush Taggart*, for defendant.

WHEELER, J. This cause has been heard by the court upon written waiver of a trial by jury. The plaintiffs are trustees of an association called by the name of the "New York & Pacific Car Trust Association," for the purpose of buying, selling, and leasing railroad equipment and rolling stock, to be sold or leased to companies owning or operating railroads. The articles of association provide that the capital stock should be issued in series of certificates representing the property, from time to time, to be classified by letters, and based upon successive contracts for equipment and rolling stock and leases thereof, and for authority in the trustees to contract with the Wabash, St. Louis & Pacific Railway Company, for the lease to the said company, and their successors, from time to time, of equipment and rolling stock, a separate lease to be made of each series of equipment and rolling stock which might be delivered to the trustees under the articles of association, upon specified terms and conditions. Pursuant to this authority, the trustees entered into an agreement with the Wabash, St. Louis & Pacific Railway Company, a corporation of Ohio, Indiana, Illinois, and Missouri, which recited this authority, and witnessed that the trustees, as well in consideration of the sum of one dollar to them paid by the said Wabash, St. Louis & Pacific Railway Company, parties of the second part, at and before the sealing and delivery thereof, the receipt of which was thereby acknowledged, as

of the rent, sums of money, and covenants thereinafter mentioned to be paid, kept, and performed by the said parties of the second part, had let and leased, and by those presents, under and by virtue of the said recited agreement, did let and lease, unto the parties of the second part and their successors, for the use of the parties of the second part in their railroad business, all and singular the railroad equipment and rolling stock, more particularly set forth in the schedule or inventory thereto annexed, with their fixtures and appurtenances, for the term of five years from and after the 1st day of December, A. D. 1879, unless sooner terminated, as thereinafter provided, at and for the rent or sums of money, for the rent or hire of the said railroad equipment and rolling stock, as thereinafter set out, to be paid to the said lessor quarter-yearly during the said term, as follows: For the first quarter, the sum of $101,250, and specifying a further sum for each of the other 19 quarters, respectively; that the first quarterly payment should be made on the 1st day of March, A. D. 1880, and thereafter the said quarterly payments should be made on the 1st days of the months of June, September, December, and March, in each year during the said term; together with further sums incidental to the contract; and that the Wabash, St. Louis & Pacific Railway Company, in consideration of the premises, did by those presents covenant and agree with the said lessors as follows: That they, the said lessee, should and would pay to the said lessors the said rent and sums of money specified, on the days and times and in the manner aforesaid, and should and would, at their proper cost and expense, keep and maintain the said equipment and rolling stock in good order and repair, and cause the same to be numbered and lettered as follows, on the body thereof, thus: "New York & Pacific Car Trust Association, No. ———," and on the bottom side rail: "N. Y. & P. C. T. A.   Series A;" and should and would replace, at their own cost, any of the said equipment and rolling stock that might be destroyed from any cause whatever during the continuance of the lease by other equipment and rolling stock of equal value and of like material, character, and construction; and should not allow the name or designation of any railroad to be placed on such equipment and rolling stock except as "lessee;" and should and would, at their own cost and expense, insure said equipment and rolling stock in such amount and in such manner as should be satisfactory to the said trustees, to whom the losses, if any, should be made payable; and that the trustees should be entitled to hold the policies; and that in case the said lessee should make default in the payment of any part of the said rent or any of said sums of money for more than 30 days after the same should become due and payable, or should fail to keep the said equipment and rolling stock in good, serviceable condition, or to keep the same insured as thereinbefore provided, or to perform any of the covenants provided to be performed on their part, the said trustees might, on the request or demand of the managers of the association, declare the said lease terminated, and by their agent enter upon the railroads and premises of the said railroad company and take all the said railroad equipments and rolling stock, and withdraw the same from the said railroads

and premises, and might also take and withdraw the said equipment and rolling stock, wheresoever the same might be found; and upon such retaking thereof the said trustees should hold and dispose of the same in such manner, at public or private sale, for cash or upon credit, as the said trustees, with the approval of the board of managers of the association, might deem most beneficial to the trust, and apply the proceeds thereof to the payment of the expenses of the trustees, insurance expenses, and taxes accrued or to become due, the expense of managing and maintaining the property, and to the rent then due, together with the interest thereon, and also to the payment and satisfaction of all installments of rent thereafter to accrue or become due, and should hold the said railway company responsible for any balance of the said rent then unpaid; and if such sale should yield any surplus the same should be paid to the railway company; and such retaking by the said trustees should not be a bar to the recovery of the rent, and the necessary taxes and expenses aforesaid; that upon the payment of all the rent and sums of money, as therein provided, then and in such case upon the payment by the said lessee to the said lessors of the further sum of one dollar, the said lessors should and would forthwith sell the said equipment and rolling stock to the said lessees, and that all the said equipment and rolling stock thereby leased should thereupon become the absolute property of the said lessees, and that neither the said lessors nor their *cestuis que trustent*, should have any further control over or interest in the same, and that the said trustees should have and hold the said railroad equipment and rolling stock and the said lease, and all the right, title, and interest therein, and should collect, receive, hold, and apply the rents and sums of money to be paid therefor and thereunder, as above provided, for the use and benefit of the holders of certificates of stock in the association, until all the said rent and sums of money should be paid, as in the said lease provided; and when, and as soon as the said rent and sums should be paid, all the said railroad equipment and rolling stock and their fixtures and appurtenances should thereupon, as above provided, be sold and transferred to and become the absolute property of the railway company, and neither the said association, nor the holders of the said stock, nor the said trustees, should have any further control over or interest in the same.

The equipment provided for in this agreement, designated "Series A," was delivered to and taken possession of by the Wabash, St. Louis & Pacific Railway Company under the terms of the agreement. Like agreements were made for three other series in succession, designated respectively "B," "C," and "D," and the equipment provided for therein was in like manner delivered and taken possession of. The agreement in respect to Series D was modified as to the rate of interest and times of payment. Default was made in respect to payments provided for in each of the agreements. Afterwards an agreement for a lease of the roads and equipment of the Wabash, St. Louis & Pacific Railway Company, including all this equipment and rolling stock, to the defendant, a corporation of Missouri and Arkansas, was made between these two companies. The stock of the defendant consisted of 220,700 shares, of which 219,459

shares were held and stood on the books of the company in the name of Jay Gould, trustee, and he was president of the company. On the 10th day of April, 1883, a lease of the roads and equipment pursuant to that agreement was made and executed by the officers of the respective companies, and on the part of the defendant, among others, by Jay Gould, president. This lease was filed in the office of the secretary of state of Missouri on the 28th day of April, 1883, with these certificates:

"The undersigned, president and secretary of the Wabash, Saint Louis & Pacific Railway Company, certify that the annexed instrument, bearing date April 10, 1883, is a certain original indenture of lease by and between the Wabash, Saint Louis & Pacific Railway Company and the Saint Louis, Iron Mountain & Southern Railway Company, and that the holders of a majority of the stock of the Wabash, Saint Louis & Pacific Railway Company have assented thereto in writing.

[Seal]                        "JAY GOULD, President,
            "Wabash, Saint Louis & Pacific Railway Company,
                        "O. D. ASHLEY, 2d Secretary,
            "Wabash, St. Louis & Pacific Railway Company."

"The undersigned, president and secretary of the Saint Louis, Iron Mountain & Southern Railway Company, certify that the annexed instrument, bearing date April 10, 1883, is a certain original indenture of lease by and between the Wabash, Saint Louis & Pacific Railway Company, and that the holders of a majority of the stock of the Saint Louis, Iron Mountain & Southern Railway Company have assented thereto in writing.

[Seal]                        "JAY GOULD, President,
        "Saint Louis, Iron Mountain & Southern Railway Company.
                        "A. H. CALEF, Secretary,
        "Saint Louis, Iron Mountain & Southern Railway Company."

Whether the defendant took possession of the roads, equipment, and rolling stock of the Wabash, St. Louis & Pacific Railway Company under this lease is a disputed question of fact upon the evidence. The respective offices of each company were filled mostly by the same persons; and many of the executive agents of each were respectively the same. Mr. Amos H. Calef, who was secretary and treasurer of the defendant company from 1881, and became such of the other in May, 1883, was called as a witness by defendant, and gave evidence tending to show that such possession was not taken. The plaintiffs offered in evidence a letter signed by him as such officer, and directed to the president and directors of the other company, dated May 10, 1884, which stated among other things, that "under the indenture of lease between the Wabash, St. Louis and Pacific R'y Co. and this company, dated April 10, 1883, the lines of the lessor company have been operated for a period of about thirteen months." It was received, subject to objection. Without considering this letter as evidence of the fact stated in it, or otherwise than as affecting the testimony of that witness, upon all the other evidence and circumstances it is found that these roads and the equipment and rolling stock were brought, by force of the lease, which was at that time recognized as valid by all, within the control and management of the defendant company. In view of the situation, and to induce the trustees to let the equipment and rolling stock remain in use upon the roads, the defendant entered into an

agreement with these trustees, dated June 26, 1883, and signed by Jay Gould, president, and A. H. Calef, secretary, which, after reciting the making of the agreements in respect to the equipment and rolling stock between the trustees and the Wabash, St. Louis & Pacific Railway Company, proceeds thus:

"Whereas, the said railway company is not in default as to each of said agreements by reason of the non-payment of certain of the sums mentioned therein; and whereas, the second party hereto has leased the railroads and equipments of said Wabash, St. Louis & Pacific Railway Company, and is desirous of preserving intact the said equipment for use in the operation of said railroads: Now, therefore, it is agreed by and between the parties as follows: *First.* The second party hereby assumes and agrees to pay to the first party the several sums remaining unpaid by the said Wabash, St. Louis & Pacific Railway Company at the times and in the manners following, provided the same are not sooner paid by the said railway company, that is to say: The principal of each of said installments of rent at the expiration of three years from the date when the same would otherwise respectively fall due, and during the three years and thereafter the interest on each and all of said installments quarterly, as required by the terms thereof, until the principal debt is paid. The second party further agrees with the first party that it will promptly and fully make good any default of the said railway company hereafter to keep and perform any and all of the remaining stipulations and covenants which the said railway company has in and by the said agreements, or any of them, agreed to keep and perform. *Second.* The first parties further agree that when and as the extended payments shall mature and become due, if the same or any of them are not paid by said railway company, then, upon receiving the money therefor from the second party, the first parties will use the funds in the purchase of, and hand over and deliver to the second party, certificates issued under the various car trusts above mentioned, corresponding at par to the amount paid by the second party under the guaranty hereinbefore stated; the second party holding the said certificates, with all interest accruing and thereafter to accrue upon, in the same manner, and with the same rights, and with the same security, as appertained thereto in the hands of the holders whose certificates they purchase; and the first parties shall give to the second parties, for any payment the second party may make on account of either principal or interest, receipts which will show that the second party have bought the rights of the holders of the certificates under the car trust to the extent of such payment, with the same rights, power, and authority as were possessed by the holders of the certificates on account of which principal or interest shall have thus been paid by the second party, and binding the first parties to hand the certificates over to the second party so soon as the first parties shall have received the same. And the first parties further agree that whenever the second party shall have paid to them any sums now or hereafter due upon any of said agreements, and not paid by said railway company, and the first parties shall also have received the entire sum which by the terms of such agreement the first parties are entitled to receive, then the said first parties will assign and transfer to the second party the said agreement and all the right, title, and interest of the second party thereon."

Thereupon the equipment and rolling stock were left to remain within the control of the defendant, in use upon the roads covered by the lease.

On May 19, 1884, the defendant company informed the Wabash, St. Louis & Pacific Railway Company that the net earnings of the roads had been insufficient to pay the interest, rentals, and other fixed charges;

that under these circumstances the St. Louis, Iron Mountain & Southern Railway would undertake to continue its advances, and it would be necessary for the Wabash, St. Louis & Pacific Railway Company to ask the holders of the junior bonds of its main lines and of the leased and acquired lines, which were said to be not self-sustaining, to fund their coupons for such a period as would enable the business to grow up to the expense and interest charges; that if the Wabash Company could accomplish this, the St. Louis, Iron Mountain & Southern Company would continue to operate the lines of the former under the lease, and in connection with the Missouri Pacific System; and that its managers felt great confidence that within a reasonable time the profit would increase sufficiently to exceed its fixed charges. . Upon receiving this information, the officers of the Wabash, St. Louis & Pacific Railway Company, some of whom were also officers of the defendant company, took steps to secure the appointment of receivers of the roads and property of the former; and on the 29th day of that May such receivers were appointed, one of whom was one of the plaintiff trustees, and they immediately took possession of the roads and property, including this equipment and rolling stock, without objection on the part of the defendant. The plaintiffs intervened in the receivership proceedings to obtain payments of installments falling due of the receivers, and succeeded to some comparatively small extent, and after the expiration of three years called upon the defendant for payment of the sums unpaid. Payment was refused, and successive suits were brought upon this agreement for installments falling due, and these actions have been consolidated into this suit.

The defenses set up and urged are that the lease is *ultra vires* and void, and that the contract depends upon that, and falls with it; that the contract is itself *ultra vires* and void; that it is within the statute of frauds; that it is a mere guaranty of the contract of the Wabash, St. Louis & Pacific Railway Company, without consideration; that, as such guaranty, no cause of action would accrue upon it until all other remedies should be exhausted. That one railway company cannot lease its road and franchises to another, or acquire those of another by lease, without statutory authority from the jurisdiction in which they are situated, is not disputed in this case, and seems to be well settled. *Thomas* v. *Railroad Co.*, 101 U. S. 71; *Railroad Co.* v. *Railroad Co.*, 118 U. S. 290, 630, 6 Sup. Ct. Rep. 1094, and 7 Sup. Ct. Rep. 24. That these things may be done with such authority follows, and also is not questioned. The Revised Statutes of Missouri of 1879 provide by section 790 that—

"Any railroad company organized in pursuance of the laws of this or any other state * * * may lease or purchase all or any part, of a railroad, with all its privileges, rights, franchises, real estate, and other property, the whole or a part of which is in this state, and constructed, owned, or leased by any other company, if the lines of a road or roads of said companies are continuous at a point either within or without this state, * * * provided that no * * * such lease * * * shall be perfected until a meeting of the stockholders of said company or companies of this state * * * shall have been called by the directors thereof, at such time and place, and in such manner, as they shall designate, sixty days' public notice thereof having

been previously given, and the holders of a majority of the stock of such company, in person or by proxy, shall have assented thereto, or until the holders of a majority of the stock of such company shall have assented thereto in writing, and a certificate thereof, signed by the president and secretary of said company or companies shall have been filed in the office of the secretary of state."

The laws of Illinois of February 12, 1855, (Priv. Laws, 304,) that—

"All railroad companies incorporated  *  *  *  under the laws of this state shall have power to make such contracts and arrangements with each other, and with railroad corporations of other states, for leasing or running their roads,  *  *  *  as shall be necessary and convenient for carrying into effect the object of this act."

The Revised Statutes of Ohio, by section 3300, that—

"Any company may lease or purchase any part or all of a railroad constructed by another company, if the lines of road of such companies are continuous or connected, and not competing, upon such terms and conditions as may be agreed upon between the companies."

Therefore, under some circumstances which might exist, the defendant could lawfully acquire the roads of the St. Louis, Wabash & Pacific Railway Company, and all of them, by lease, except that part in Indiana. *Railroad Co.* v. *Railroad Co.*, 118 U. S. 290, 6 Sup. Ct. Rep. 1094. The only condition required as to Missouri and Ohio is that the roads should be continuous or connected; and none appears to be required as to Illinois. At the time of the lease trains of all the roads ran to and from a union depot in St. Louis. To do this, trains of the defendant crossed a track of the Missouri Pacific Railway Company, running in the same direction, by being switched onto it from one side and passing along on it 134 feet, and then being switched off on the other side; and trains of that part of the roads of the Wabash, St. Louis & Pacific Railway Company east of the Mississippi river passed over the track of a bridge and tunnel company across the Mississippi river to the depot, by right acquired by lease. They connected otherwise by their own tracks. These breaks, such as they were, separated parts of their own roads, and not the roads of these parties, from one another. These methods of crossing the track of another road and the river do not appear to break the connection between the two roads, within the meaning of these statutes; and these lines are found upon the evidence of this situation and these circumstances, as a matter of fact, to have been connected and continuous. The holders of a large majority of the stock of each company appear to have assented to the lease at meetings when that subject was considered, but not at any meeting called and held for that purpose. No vote at any meeting was required by the laws of Missouri, if the holders of a majority of the stock assented to the lease in writing, and the proper certificates were filed in the office of the secretary of state. The propositions voted upon were in writing, and the voting was by written ballots. This is argued to have been an assent in writing to the lease; but the ballots were not signatures, and were cast to accomplish corporate, and not individual, action. This does not seem to amount to the assent in

writing contemplated by the statute. No other assent of the holders of a majority of the stock of the two companies is shown otherwise than by the certificates. Those appear to be designed to furnish authentic evidence of the fact of assent; and whether the plaintiff is required to go beyond them, or the defendant is entitled to go behind them, is doubtful. However that may be, the president of the defendant, who signed the certificate held almost the whole of the stock of that company. There could be no majority without him. The statement by him in the certificate, that a majority had assented, implies that he had assented. Blanks for such assent were attached to the lease, and not signed. The statute does not require the assent to be in any particular form or place. If the certificate is true, and it is to be so regarded, it appears to prove that the president had somewhere made such an assent, or considered the certificate, as amounting to one. In either case, one was made which was satisfactory to him, both as stockholder and president, and was evidenced in the manner required by the statute. The lease was therefore well executed in behalf of the defendant as lessee, and not *ultra vires* on that part. It was not disputed, but was yielded to on the part of the lessor, however defective the execution of that part may have been. This rolling stock and equipment was personal property, which might be sold or bailed by parol and delivery. The leases were sufficient to pass the right of the Wabash, St. Louis & Pacific Railway Company to that when accompanied by delivery. The defendant therefore had, by the contract of lease, well made on its part, and by concession and sufferance on the part of the lessor, this road to operate, and the possession of this equipment and rolling stock to operate it with, subject to the rights of the plaintiffs, when this contract was made. It provided a mode for retaining the possession of, and gradually acquiring the title to, the rolling stock and equipment. Nothing appears to be more clearly within the scope of the corporate powers of a railway corporation than the procurement of equipment and rolling stock for the roads it has to operate. Had the defendant at that time bought or hired engines and cars for this use, it could no more have resisted payment for them than it could for the services of train-men employed by it to run the trains, or of track-men employed to keep the track in repair. The fulfillment of this contract would procure the use of necessary engines and cars, and ultimately the title to them. The defendant had in fact taken upon itself the operating of the roads, which made the rolling stock and equipment desirable and necessary, and represented to the plaintiffs that it had by the terms of the contract. The ability to make such contracts, under such circumstances, whether the underlying title of the defendant was valid or not, is shown in *Zabriskie* v. *Railroad Co.*, 23 How. 381, and *McCluer* v. *Railroad Co.*, 13 Gray, 124. In the former case Mr. Justice CAMPBELL said in delivering the opinion of the court:

"A corporation, quite as much as an individual, is held to a careful adherence to truth in their dealings with mankind, and cannot, by their representations or silence, involve others in onerous engagements, and then defeat the calculations and claims their own conduct had superinduced."

In the latter, which was an action upon a contract of carriage over the Methuen Branch Railroad, that the defendant was operating under a lease said to be *ultra vires* and void, HOAR, J., said:

"The decision of this court in the recent case of *Langley* v. *Railroad Co.*, 10 Gray, 103, rests upon grounds wholly distinct from those upon which this action is based. The court there decided that the Boston & Maine Railroad, being the owners of the Methuen Branch Railroad, and authorized to run cars over it as common carriers of passengers and freight, could not, without the authority of the legislature, lease that road to a corporation created by another state, and transfer their powers and duties to such corporation, so as to discharge themselves from liability for injuries to persons or property which might arise in the use of the road. But if the plaintiff in the present action might have had a remedy, at his election, against the Boston & Maine Railroad, he is not therefore precluded from seeking it against the party with whom he directly contracted. The defendants, so far as any evidence showed, were competent to hire and use the Methuen Branch Railroad, if they could find any party that would permit them to use it, and put them in possession. They were in the actual possession and use of it, without obstruction from the Boston & Maine Railroad of the commonwealth; and they received the plaintiffs' property through their agents, and agreed that it should be safely kept, and transported to its destination. It is no answer to a breach of that agreement, to deny the validity of their own contract for the use of the road."

This contract does not appear to be void from any want of corporate authority to make it. The questions made in respect to the consideration, construction, and effect of the contract are to be determined in view of the situation out of which it grew, and to which it is to be applied. The contracts between the plaintiffs and the Wabash, St. Louis & Pacific Railway Company, in respect to this equipment and rolling stock, are in the instruments called "leases," and they are sometimes said to be "contracts for conditional sales," and at other times, "mortgages." Neither of these names would seem to be apt to describe them fully, and perhaps they partake somewhat of the nature of such instruments as each of these terms is usually applied to. The title to the property was not to pass until payment, and in that respect they resembled conditional sales. The use of the property by the conditional purchase was provided for on compensation, and in that respect they would have the qualities of a lease, so far as that name is applicable to agreements for the use of personal property. And they provided for security on the property in the hands of the so-called "lessee," and in that respect were like mortgages. In all aspects they fixed the right of the plaintiff to retake the property on default. A default had been made, and the property was subject to the right of the plaintiffs to remove it at once; and the lease passed the right to redeem to the defendant, subject to the rights of the plaintiffs. If the lessor redeemed, the defendant would have the property of the lessor under the lease. If the defendant fulfilled the contract, it would have the property as purchaser. The undertaking of the defendant to pay what should remain unpaid at the prescribed times was an agreement to pay the price of the use and ownership of the property which it would have of the plaintiffs. What the lessor should pay, it would pay for itself. The reference to what should

remain unpaid was for the purpose of fixing the amount to be paid by the defendant, and not to express an agreement to see that the defendant paid. The consideration was the use of the property to be had, and the ownership of it to be acquired. Such an agreement to pay money towards the price of property received was early held not to be within the statute of frauds. *Williams* v. *Leper*, 3 Burrows, 1886; *Castling* v. *Aubert*, 2 East, 325; *Edwards* v. *Kelly*, 6 Maule & S. 204. These considerations lead to the conclusion that the contract is not a mere guaranty, but a direct undertaking, on which the plaintiffs have the right to proceed against the defendant in the first instance.

The evidence tending to show that the lease was not executed according to the laws of the several states in which the road was situated, as well as evidence showing that the stock of the defendant corporation held by Jay Gould, trustee, was in fact held for the Missouri Pacific Railway Company, was received subject to objection, without passing definitely upon its materiality, to make the case complete. The Missouri Pacific Railway Company is a corporation of Missouri, and as such appears to have had authority to hold the stock, and to assent to the lease, either by itself or through a trustee. The presumption is that the act of the trustee was authorized or approved by that company, if anything in that behalf was necessary; and this presumption is not rebutted.

The argument made in behalf of the defendant, that want of power to take a lease of the roads would involve want of power to operate them, or to provide means for operating them, although sound in law, does not appear to be well founded in the actual situation. The defendant was not without power by the laws of its *situs* to take title by lease or otherwise of all of those roads. The laws of Missouri already recited appear to have conferred ample authority to acquire title to them in any manner in which it could be obtained; and title could be obtained to all of them in some form, and by lease to all except that part in Indiana, by procuring the execution of conveyances with the required formalities. The defendant accepted such an instrument in that behalf as was made, and that operated to give the defendant the roads. Whether this operation was due to the concession of the lessor, or to the force of the instrument, the defendant acquired the roads with authority to operate them, and to provide for their operation. In this view, the defendant became bound by its contract with the plaintiffs to provide rolling stock and equipment, without reference to the actual validity of the lease as against the lessor. The defendant, as lessee, could not dispute the lessor's title as against the lessor; and still less could it dispute that title as against third parties and strangers to the lease, who had dealt with the defendant on its own representation of the lease. This evidence, therefore, now appears to be immaterial, but the facts shown by it are in the case, to have such weight as may be found to belong to them, if any, in the further progress of the cause. Upon the whole case, as now considered, the plaintiffs are entitled to recover of the defendant the installments for which the actions consolidated into this one were brought. There must therefore be judgment for the plaintiffs.